**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSHUA HARRIS,<br>on behalf of Plaintiff and the class members<br>described below, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 1:23-cv-01114 |
| EAGLE VALLEY VENTURES, d/b/a<br>EAGLE VALLEY LENDING;<br>FAST AUTO LOANS INC.;<br>and JOHN DOES 1-20, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT – CLASS ACTION**

1.     Plaintiff, Joshua Harris, brings this action to secure redress from predatory and unlawful loans (such as Exhibit A). The loans are made in the name of Defendant Eagle Valley Ventures d/b/a Eagle Valley Lending ("Eagle Valley Lending"), which claims to be "a wholly-owned and operated entity, arm, and instrumentality of Tonto Apache Growth, a wholly-owned instrumentality of the Tonto Apache Tribe, a federally-recognized sovereign American Indian tribe." (Exhibit B). In fact, Defendant Fast Auto Loans Inc. is the beneficial owner of the loans made by Eagle Valley Lending. Other parties involved in making the loans are named as John Does 1-20.

2.     Plaintiff seeks a declaratory judgment that the loans are void and an injunction against their collection (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count II), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq.*, and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* (Count III – the Predatory Loan Prevention Act provides that violations are a violation of the Illinois Consumer Fraud Act), and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964 (Counts IV and V).

1

## JURISDICTION AND VENUE

3.  The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367. Jurisdiction may also exist under 28 U.S.C. § 1332(d).

4.  This Court has personal jurisdiction over Defendants because they:

    a.  Knowingly participated in the making and collection of unlawful loans to Indiana residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello,* 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures,* 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

    b.  Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

5.  Venue is proper because acts to obtain and collect the loans impacted Plaintiff in Indiana.

6.  Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92

2

Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiff

7.      Plaintiff Joshua Harris is a resident of Chicago, Illinois.

### Defendants

8.      Defendant Eagle Valley Ventures d/b/a Eagle Valley Lending claims to be "a wholly-owned and operated entity, arm, and instrumentality of Tonto Apache Growth, a wholly-owned instrumentality of the Tonto Apache Tribe, a federally-recognized sovereign American Indian tribe." It is an online lender that offers loans to consumers at annual percentage rates in excess of 700%. It uses the address 30 Tonto Apache Tribe, Suite 138, Payson, Arizona 85541.

9.      Defendant Fast Auto Loans, Inc. is a corporation organized under California law with its principal address at 8601 Dunwoody Place, Suite 406, Atlanta, GA 30350. Its registered agent and office is C T Corporation System, 330 N. Brand Blvd., Ste. 700, Glendale, CA 91203.

10.     Defendants John Does 1-20 are other natural and artificial persons involved in the lending activities described herein.

### Relationships Between Defendants

11.     Eagle Valley Lending is a "rent-a-tribe" scheme, in which non-Native American persons conduct business as a purported instrumentality of Native American tribes to evade state usury laws, paying a small percentage of the proceeds to the tribe.

12.     The  loans made by Eagle Valley Lending are offered via two websites:

    a.      https://eaglevalleylending.com/

    b.      https://fastautoloansinc.com/

13.     If a person accesses www.fastautoloansinc.com, a popup message asks if the person lives in Arizona or California. If the person clicks Arizona, they are offered a loan by Defendant Fast Auto Loans, Inc., directly. If the person clicks California, they are instantly redirected to

www.eaglevalleylending.com. This is done even though Eagle Valley Lending purports to be located in Arizona.

14.     The fact that loans to persons in one state are offered by a "tribal" lender and loans to persons in another state are offered by a non-tribal lender is indicative of a "rent-a-tribe" scheme.

15.     Defendant Fast Auto Loans, Inc. is the true owner of the loans made by Eagle Valley Lending, and receives most of the income generated by Eagle Valley Lending loans.

16.     A law firm called Rosette, LLP devises "rent a tribe" schemes, as outlined herein, in which it "matches" "investors" with tribes.

17.     Rosette, LLP provides "turnkey" high-interest Internet lending operations to the "investors."

18.     Rosette, LLP holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm (last visited on February 13, 2023); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 840 (E.D. Va. 2020) (detailing the role of Rosette in the origin of the tribal lending businesses).

19.     The tribes that Rosette, LLP "matches" with investors tend to be small and in poor economic straits.

20.     The Tonto Apache Tribe is tiny. It has an eighty-five (85) acre reservation in Arizona. This is the smallest Indian reservation in Arizona. The total population of the reservation is about 140 persons, of whom 110 are enrolled members.

21.     Attorney Rob Rosette of Rosette, LLP created a company called Tribal Loan Management, LLC to "provide an entire turn-key lending operation to provide consumers with small loans."

22.     The usual arrangement is that:

        a.      Rosette, LLP locates a tribe and one or more "investors" for a high-interest

4

Internet lending operation;

b.    A lender wholly owned by the tribe enters into a servicing agreement with a non-Indian "servicer," pursuant to which the servicer received the vast majority of revenue generated.

23.    Eagle Valley Lending is not the only Internet lender to have been purportedly owned by the Tonto Apache Tribe. The Tribe also purports to own Comet Loans (Exhibit C).

24.    The existence of multiple lenders purportedly belonging to very small Native American tribes is indicative of a "rent-a-tribe" arrangement. Each lender typically represents a different group of non-Native American persons. Sometimes a group changes its name to evade regulatory scrutiny.

25.    Rosette, LLP's involvement was confirmed when Plaintiff, by counsel, demanded cancellation of his illegal loan (Exhibit D).

26.    Plaintiff received a response from one Anna Bruty on the letterhead of Eagle Valley Lending (Exhibit E), asserting that she was "general counsel" of Eagle Valley Lending and that Eagle Valley Lending was entitled to "continue to attempt collection on your client's account . . . ."

27.    In fact, Anna Bruty is an attorney at Rosette, LLP, at its Michigan office (Exhibit F). On information and belief, she is not a member of the Tonto Apache Tribe.

28.    On information and belief, the "general counsel" services are part of the "turnkey" lending operation.

29.    Eagle Valley Lending does business in Illinois over the Internet, via text message, via Automated Clearing House transactions, and over the telephone.

30.    At no time have Defendants had a license from the Illinois Department of Financial and Professional Regulation or a state or federal banking or credit union charter, entitling them to make loans to Illinois residents at more than 9% interest.

31.    Defendants nevertheless advertise and make loans to Illinois residents at rates greatly exceeding 9%.

5

32.     Defendants sought out Illinois residents for such loans. Its website (Exhibit B) states that it makes loans to residents of Illinois but not residents of other states. On information and belief, the selection of states is tied to the likelihood of state officials taking enforcement action against Defendants.

33.     On information and belief, the principal economic benefit of the activities of Eagle Valley Lending is received by non-Native American persons.

## FACTS RELATING TO PLAINTIFF

34.     On or about December 7, 2021, Plaintiff Joshua Harris took out a loan from Eagle Valley Lending (Exhibit A). The loan had an amount financed of $1,000 and an annual percentage rate of 396.54%.

35.     The rate was more than ten times the maximum permissible rate in Illinois.

36.     Plaintiff made payments on the loan, including interest.

37.     Eagle Valley Lending claims that amounts are still outstanding. (Exhibit E)

38.     Exhibit A is written on a standard form loan agreement used by Eagle Valley Lending on a regular basis.

39.     Defendants regularly make loans to individuals in Illinois at such rates.

40.     The Eagle Valley Lending website (Exhibit B) lists states in which Defendants will not make loans. Illinois is not one of these states. Defendants thus seek business from Illinois consumers.

41.     The loan was obtained for personal, family or household purposes and not for business purposes.

## ILLINOIS PROHIBITIONS ON PREDATORY LOANS

42.     Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 *et seq.* "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any

principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

43.     Under 815 ILCS 123/15-10-5(b), "[a]ny violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

44.     Both before and after March 23, 2021, it was unlawful for anyone who did not have a bank or credit union charter or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

45.     Any loan made by an unlicensed person to an Illinois resident at more than 9% interest is void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."); 815 ILCS 122/4-10(h) ("(h) Notwithstanding any other provision of this Section, if a lender who does not have a license issued under this [Payday Loan Reform] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

46.     Any loans to Illinois residents at more than 9% interest that are made by unlicensed lenders violate the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under 815 ILCS 205/6.

47.     Illinois' criminal usury statute provides that the making of a loan by an unlicensed person at more than 20% interest is a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq*). It applies to persons who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engage in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

7

48.     Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC,* 11cv8149, 2017 WL 758518, at *11 (S.D.N.Y. Feb. 27, 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.,* 16cv2781, 2017 WL 1536427, *7 (D.N.J., April 28, 2017).

49.     The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *E.g., In the Matter of Red Leaf Ventures, LLC,* No. 12 CC 569), *In the Matter of Money Mutual, LLC*, No. 12 CC 408; *In the Matter of Hammock Credit Services*, No. 12 CC 581; *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133.

## RENT-A-TRIBE SCHEMES

50.     In an attempt to evade prosecution under usury laws of states like Illinois, non-tribal owners of online payday lending businesses frequently engage in a business model commonly referred to as a "rent-a-tribe" scheme.

51.      Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

52.     The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe.

53.     In exchange for use of the tribe's name, the beneficial owner of the payday lending

scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

54.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

55.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

56.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by non-tribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

57.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

58.     Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

59.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal

9

sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on fourteen felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

## COUNT I - DECLARATORY AND INJUNCTIVE RELIEF AGAINST ILLEGAL CONDUCT

60. Plaintiff incorporates paragraphs 1-59.

61. This claim is against all Defendants.

62. There is a controversy between Plaintiff and the class, on the one hand, and Defendants, on the other, as to whether Plaintiff and the class members must repay the loans made to them.

63. Declaratory relief will resolve such controversy.

64. An injunction is necessary to prevent Defendants from taking any action to collect the void debts.

## CLASS ALLEGATIONS

65. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

66. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Eagle Valley Lending at more than 9% interest (c) which loan has not been paid in full.

67. Plaintiff may alter the class definition to conform to developments in the case and discovery.

68. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

10

69. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

70. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

71. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

72. Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

73. The class is entitled to a declaration that Defendants are not entitled to collect on the loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

   i. Injunctive relief;

   ii. Declaratory relief;

   iii. Restitution of all amounts collected on the loans from members of the class;

   iv. Costs of suit; and

   v. Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS INTEREST ACT

74. Plaintiff incorporates paragraphs 1-59.

75. This claim is against all Defendants.

76. Defendants contracted for and collected loans at more than 9% interest from Plaintiff and the class members, in violation of 815 ILCS 205/4.

11

77. Plaintiff and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

78. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

79. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Eagle Valley Lending at more than 9% interest (c) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

80. Plaintiff may alter the class definition to conform to developments in the case and discovery.

81. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

82. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

83. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

84. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

85. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i.        Damages as provided in 815 ILCS 205/6.

ii.        Attorney's fees, litigation expenses and costs of suit; and

iii.        Such other and further relief as the Court deems proper.

## COUNT III – PREDATORY LOAN PREVENTION ACT
## AND ILLINOIS CONSUMER FRAUD ACT

86.     Plaintiff incorporates paragraphs 1-59.

87.     This claim is against all Defendants.

88.     Defendants contracted for and collected loans prohibited by the Illinois Predatory Loan Prevention Act.

89.     Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

## CLASS ALLEGATIONS

90.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

91.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Eagle Valley Lending at more than 36% interest (all of its loans qualify) (c) on or after March 23, 2021.

92.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

93.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

94.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

13

95.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

96.     Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

97.     A class action is superior for the fair and efficient adjudication of this matter, in that:

        a.     Individual actions are not economically feasible.

        b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

        i.     Compensatory damages;

        ii.     Punitive damages;

        iii.     Attorney's fees, litigation expenses and costs of suit; and

        iv.     Such other and further relief as the Court deems proper.

## COUNT IV – RICO

98.     Plaintiff incorporates paragraphs 1-59.

99.     This claim is against Defendant Fast Auto Loans, Inc. who is the RICO "person."

100.    All loans made in the name of Eagle Valley Lending to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where (c) the usurious rate is at least twice the enforceable rate (9%).

101.    The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

102.    Eagle Valley Lending is an enterprise affecting interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet.

103.    Defendant Fast Auto Loans, Inc. is associated with this enterprise.

104.    Defendant Fast Auto Loans, Inc. conducted or participated in the conduct of the affairs of Eagle Valley Lending through a pattern of collection of unlawful debt, as set forth above,

in violation of 18 U.S.C. § 1962(c).

105.    Plaintiff and the class members were deprived of money as a result.

## CLASS ALLEGATIONS

106.    Plaintiff brings this claim on behalf of a class.

107.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Eagle Valley Lending at more than 18% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

108.    Plaintiff may alter the class definition to conform to developments in the case and discovery.

109.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

110.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

      a.    Whether the loans at issue are "unlawful debts" as defined in RICO.

      b.    Whether Eagle Valley Lending is an "enterprise."

      c.    Whether Defendant Fast Auto Loans, Inc. is associated with Eagle Valley Lending.

      d.    Whether Defendant Fast Auto Loans, Inc. conducted or participated in the affairs of Eagle Valley Lending through a pattern of making and collecting unlawful loans.

111.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

112.    Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

113. A class action is superior for the fair and efficient adjudication of this matter, in that:

      a. Individual actions are not economically feasible.

      b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i. Treble damages;

      ii. Attorney's fees, litigation expenses and costs of suit; and

      iii. Such other or further relief as the Court deems proper.

## COUNT V – RICO

114. Plaintiff incorporates paragraphs 1-59.

115. This claim is against all Defendants except Eagle Valley Lending.

116. All loans made in the name of Eagle Valley Lending to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where (c) the usurious rate is at least twice the enforceable rate (9%).

117. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

118. Eagle Valley Lending is an enterprise affecting interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet.

119. The Defendants other than Eagle Valley Lending conspired and agreed that Eagle Valley Lending would make and enforce loans to Illinois residents that were at such high rates that they were unenforceable under Illinois law in whole or in part as to principal or interest because of loans relating to usury.

120. Pursuant to such conspiracy:

      a. Arrangements were made, as set forth above, to make Internet loans;

      b. Loans were made to Plaintiff and others;

      c. The loans were collected via ACH debit;

      d.      Correspondence was sent (Exhibit E) and telephone calls were made for the purpose of collecting the loans.

121.    Plaintiff and the class members were deprived of money as a result.

## CLASS ALLEGATIONS

122.    Plaintiff brings this claim on behalf of a class.

123.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Eagle Valley Lending at more than 18% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

124.    Plaintiff may alter the class definition to conform to developments in the case and discovery.

125.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

126.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

      a.      Whether the loans at issue are "unlawful debts" as defined in RICO.

      b.      Whether Eagle Valley Lending is an "enterprise."

      c.      Whether the other Defendants conspired to make, enforce and collect usurious loans through Eagle Valley Lending.

127.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

128.    Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

129.    A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.      Individual actions are not economically feasible.

       b.      Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

        i.      Treble damages;

        ii.      Attorney's fees, litigation expenses and costs of suit; and

        iii.      Such other or further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman (ARDC 0712094)
Tara L. Goodwin (ARDC 6207473)
Dulijaza (Julie) Clark (ARDC 6273353)
Matthew J. Goldstein (ARDC 6339033)
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## JURY DEMAND

Plaintiff demands trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

## DOCUMENT PRESERVATION DEMAND

Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman